James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Jay W. Eisenhofer
Stuart M. Grant
John C. Kairis
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

Mark Lebovitch
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
1285 Avenue of the Americas
New York, New York 10019
(212) 554-1400

*Attorneys for Plaintiff*

[Additional Counsel for Plaintiff Appear on Signature Page]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all other similarly situated shareholders of VULCAN MATERIALS COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> PHILIP J. CARROLL, JR., PHILLIP W. FARMER, H. ALLEN FRANKLIN, DONALD M. JAMES, ANN MCLAUGHLIN KOROLOGOS, DOUGLAS J. MCGREGOR, RICHARD T. O'BRIEN, JAMES T. PROKOPANKO, DONALD B. RICE, VINCENT J. TROSINO, and VULCAN MATERIALS COMPANY, <br><br> Defendants. | Civil Action No. <br><br><br> **COMPLAINT and** <br> **DEMAND FOR JURY TRIAL** |

Plaintiff Louisiana Municipal Police Employees' Retirement System ("Plaintiff"), by its undersigned counsel, on behalf of itself and all other similarly situated public shareholders of Vulcan Materials Company ("Vulcan" or the "Company"), files this class action complaint (the "Complaint") against the members of the Vulcan board of directors (the "Board" or "Vulcan Board").  The allegations of this Complaint are based on the personal knowledge of Plaintiff as to itself and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters.

## INTRODUCTION

1.      This action arises because of the self-interested and unreasonable refusal of the Vulcan Board to negotiate with Martin Marietta regarding Martin Marietta's compelling proposals to acquire Vulcan, and the Board's improper reliance on an array of protections and defensive measures which make Martin Marietta's unsolicited takeover of Vulcan a practical impossibility.

2.      In response to ongoing discussions and specific offers by Martin Marietta over an extended period of time, the Vulcan Board has acted against the interests of Vulcan's shareholders.  Rather than accepting any of Martin Marietta's reasonable offers or continuing to negotiate over their terms, the Vulcan Board terminated discussions between the companies and left Martin Marietta with no alternative but to commence an unsolicited exchange offer to acquire Vulcan.

3.      Moreover, the Board has already demonstrated that it is not proceeding in good faith in considering Martin Marietta's exchange offer or any previous offers from Martin Marietta.  In response to a Martin Marietta lawsuit against Vulcan in New Jersey Superior Court for an injunction to prevent Vulcan from improperly impeding Vulcan shareholders' ability to

consider and accept Martin Marietta's proposals, the Vulcan Board accused Martin Marietta of "covertly plotting a hostile bid" while the discussions between the companies were ongoing (prior to being terminated by Vulcan).

4.     In addition, while Martin Marietta has publicly stated that it would prefer a friendly deal, Vulcan explained in its New Jersey filing that there is no chance of that happening, stating:

> The offer is conditioned on the approval of Vulcan's board of directors – another condition that has no likelihood of being satisfied any time in the foreseeable future, if any.

5.     The Vulcan Board's breach of fiduciary duties is further demonstrated by certain pre-existing protections, and defensive measures implemented by the Vulcan Board, which make consummation of Martin Marietta's pending offer an impossibility.

6.     *First*, Vulcan has a staggered board structure that means that about a third of Vulcan's twelve directors are up for election in any given year.  Thus, any potential hostile acquiror must win two consecutive stockholder elections in order to obtain a majority of the Board.  That prospect is unrealistic and unlikely, even for a *bona fide* bidder, in light of the costs and burdens of running proxy contests.

7.     *Second*, Vulcan's Restated Certificate of Incorporation (the "Charter") prohibits removal of directors except for cause and only upon approval by a majority of the Board. Moreover, the staggered Board provision in the Charter may only be removed or altered with a supermajority vote of 80% of all stockholders, an approval rate that is extremely unlikely to be achieved no matter what the proposal.

8.     *Third*, the Board can unilaterally increase the size of the Board, fill Board vacancies, and add or change Bylaws without shareholder approval.  The Board can also use

various mechanisms (such as director questionnaires) to frustrate a third party's ability to nominate candidates to the Vulcan Board.

9.    *Fourth*, the New Jersey Shareholder Protection Act prohibits anyone with a 10% stake in the Company from entering a merger with Vulcan for a period of five years, absent Board approval.  Significantly, the Board has not opted out of this statute.  Thus, the application of the statute to Vulcan along with the Board's position would effectively prevent Martin Marietta from consummating any acquisition of Vulcan for five years (absent Board approval).

10.    *Fifth*, under Vulcan's Charter, any business combination between Vulcan and a shareholder owning 10 percent or more of the Company requires the approval of 80% of the Company's stock entitled to vote.  While the approval of a majority of Vulcan's "Continuing Directors" and certain "fair price" conditions serve as exceptions to the 80% shareholder approval requirement, the Vulcan Board's refusal to approve any of Martin Marietta's offers ensures that the supermajority, as opposed to simple majority, vote requirement will apply.

11.    In terminating all discussions with Martin Marietta and refusing to dismantle the protections and defensive measures that are already in place or opt-out of the New Jersey Shareholder Protection Act, the members of the Vulcan Board have breached their fiduciary duties.  As a result of these breaches, Vulcan shareholders are precluded from exercising their shareholder franchise to determine whether a sale to Martin Marietta is the best strategic alternative.

12.    Plaintiff thus seeks a determination that the Board's conduct constitutes an unreasonable failure to respond and a continuing breach of its fiduciary duties, and other appropriate relief to enjoin the Board from improperly impeding Martin Marietta's pending exchange offer at the expense of the interests of the public Vulcan stockholders.

**JURISDICTION/VENUE**

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

14.     Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District.  In addition, Vulcan is a New Jersey corporation and one or more of the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

15.     Plaintiff Louisiana Municipal Police Employees' Retirement System is a stockholder of Vulcan and has been a stockholder of Vulcan at all material times alleged in this Complaint.

16.     Defendant Vulcan is a New Jersey corporation headquartered in Alabama. Vulcan produces aggregates for public, commercial and residential construction.   Vulcan currently pays a quarterly cash dividend of a penny per share.  Vulcan's common shares publicly trade on the New York Stock Exchange under the ticker symbol "VMC" and, as of September 30, 2011, Vulcan had 129.23 million common shares outstanding.

17.     Defendant Philip J. Carroll, Jr. ("Carroll") has served as a member of the Vulcan Board since 1999.  During 2010, Vulcan paid Carroll total compensation of $200,694 for his Board service.  Carroll's son is a partner at a law firm that has provided legal services to Vulcan for over 50 years.  Carroll is a resident of Texas.

18.     Defendant Phillip W. Farmer ("Farmer") has served as a member of the Vulcan Board since 1999.  During 2010, Vulcan paid Farmer total compensation of $209,441 for his Board service.  Farmer is a resident of Florida.

19.     Defendant H. Allen Franklin ("Franklin") has served as a member of the Vulcan Board since 2001.  Franklin is the former Chairman, President and Chief Executive Officer of Southern Company ("Southern"), a super-regional energy company at which Vulcan's CEO Donald M. James ("James") currently serves on the board of directors.  During 2010, Vulcan paid Franklin total compensation of $200,040 for his Board service.  Franklin is a resident of Georgia.

20.     Defendant Donald M. James has served as the Company's CEO and Chairman of the Board since May 1997.  James also serves on the board of directors of Southern, a company at which Defendant Franklin was the former Chairman, President and CEO.  During 2010, Vulcan paid James over $8 million in total compensation.  James is a resident of Alabama.

21.     Defendant Ann McLaughlin Korologos ("Korologos") has served as a member of the Vulcan Board since 1990.  During 2010, Vulcan paid Korologos total compensation of $179,933 for her Board service.  Korologos is a resident of Washington, D.C.

22.     Defendant Douglas J. McGregor ("McGregor") has served as a member of the Vulcan Board since 1992.  During 2010, Vulcan paid McGregor total compensation of $209,823 for his Board service.  McGregor is a resident of Ohio.

23.     Defendant Richard T. O'Brien ("O'Brien") has served as a member of the Vulcan Board since 2008.  During 2010, Vulcan paid O'Brien total compensation of $185,171 for his Board service.  O'Brien is a resident of Colorado.

24.     Defendant James T. Prokopanko ("Prokopanko") has served as a member of the Vulcan Board since 2009.  During 2010, Vulcan paid Prokopanko total compensation of $175,175 for his Board service.  Prokopanko is a resident of Minnesota.

25.     Defendant Donald B. Rice ("Rice") has served as a member of the Vulcan Board since 1986.  During 2010, Vulcan paid Rice total compensation of $206,555 for his Board service.  Rice is a resident of California.

26.     Defendant Vincent J. Trosino ("Trosino") has served as a member of the Vulcan Board since 2003.  Trosino is the former President, Vice Chairman of the board of directors and Chief Operating Officer of State Farm Mutual Automobile Insurance Company, Vulcan's largest shareholder.  During 2010, Vulcan paid Trosino total compensation of $194,151 for his Board service.  Trosino is a resident of Florida.

27.     As directors of the Company, the defendants referred to in paragraphs 17 to 26 above (collectively the "Individual Defendants" or "Director Defendants"), are in a fiduciary relationship with the Company, Plaintiff and the public stockholders of Vulcan, and owe them the highest obligations of loyalty and care.  Further, Defendant James owes the same fiduciary duties in discharging his responsibilities as one of the Company's executive officers.

## FACTUAL ALLEGATIONS

### A.     Vulcan's Financial Condition Deteriorates under the Board's Leadership

28.     Several years ago, Vulcan was considered the leader and strongest producer of aggregates and other materials for the construction industry.  However, sagging operating performance has (i) crushed Vulcan's stock price, (ii) forced the Company to slash its quarterly dividend, (iii) led the Company to repeatedly fall short of earnings expectations and (iv) caused the ratings agencies to reduce Vulcan's credit rating.

29.     Vulcan's stock, which traded as high as $128.62 on April 30, 2007, has lost over 75% of is value.  In October 2011, Vulcan's stock hit a 5-year low of $25 before leveling out around $34 per share, where it currently trades.

30.     A marked decline in cash flows forced Vulcan to retrench and dramatically cut its dividend.  On October 14, 2011, Vulcan reduced its quarterly dividend from twenty five cents per share to a penny per share, a 96 percent reduction.

31.     On November 2, 2011, Vulcan announced earnings for the third quarter ending September 30, 2011.  The Company reported revenue of $715 million, $46 million short of Wall Street expectations.  Vulcan incurred a loss of $41 million from continuing operations, compared to a projected profit of 6 cents.  Since the fourth quarter of 2008, Vulcan has missed earnings estimates in all but one quarter.

32.     As a result of the Company's deteriorating performance, lack of liquidity and failure to reduce its billion dollar debt load, both Moody's and S&P have significantly downgraded Vulcan's credit rating.  Vulcan's $2.8 billion debt load is the highest among comparably-sized construction materials companies in the U.S., according to data compiled by Bloomberg.

33.     On October 24, 2011, Moody's issued a report entitled "Vulcan Materials vs. Martin Marietta Materials, A Comparison of the Two Largest US Aggregates Producers" (the "Moody's Report").  The report noted that Vulcan, "once the stronger of the two US rated aggregates producer, is now the weaker one. … In response to the company's deteriorating condition, we've downgraded its credit ratings five notches over the past three years."  Currently, both Moody's and S&P have Vulcan rated two levels below investment grade (*i.e.*, "junk" status).

**B.     While Vulcan Struggled, Martin Marietta Soared**

34.     While the Vulcan Board was destroying a significant amount of shareholder value, the Company's chief competitor, Martin Marietta, was thriving.

35.     Since C. Howard Nye ("Nye") became CEO of Martin Marietta, the company has implemented a focused cost management strategy, including a reduction of discretionary spending and decrease in overhead through various cost-cutting measures.   Simultaneously, Martin Marietta's senior management strengthened the company's balance sheet providing needed stability during the credit crisis.   These initiatives allowed Martin Marietta to pay a robust annual dividend of $1.60 per share.

36.     The contrast between Martin Marietta's and Vulcan's financial results is stark. For example, in 2010, (i) Martin Marietta's revenues increased 4.7 percent from the prior year while Vulcan's revenues declined by 4.9 percent; (ii) Martin Marietta's core operating expenses were approximately 7.5 percent of total revenues compared to Vulcan's 12.7 percent; and (iii). Martin Marietta reported an EBITDA-to-sales ratio of 21% while Vulcan reported an EBITDA-to-sales ratio of only 13.7%, indicating that Martin Marietta was able to generate higher earnings by keeping expenses low.

37.     The Moody's Report contrasted the steady deterioration of Vulcan's credit rating with Martin Marietta's strong performance:

> Martin Marietta Materials, Inc., by contrast, has maintained its credit rating since late 2008.  The company operates in geographic regions that have better withstood the contraction in public and private construction of the past several years.  The company has also been more effective at cutting costs and controlling its debt levels than Vulcan and generates a larger percentage of revenue from the high-margin aggregates business.

38.     The Moody's Report also noted that Martin Marietta's sales and earnings have held relatively steady, and recognized that the "stability reflects both cost-cutting measures Martin Marietta has enacted over the past couple of years …."

### C.  Vulcan and Martin Marietta Commence Discussions Regarding a Strategic Transaction

39.     For years, Martin Marietta has considered the possibility of acquiring or combining with Vulcan, and senior management of the two companies have periodically engaged in discussions.

40.     Those discussions took a more serious tone in May 2010.  On May 3, 2010, Martin Marietta and Vulcan entered into a non-disclosure agreement ("NDA").  Significantly, the parties did not include a standstill provision in the NDA which would have prohibited either party from making a public offer for the other.

41.     For the year following execution of the NDA, Martin Marietta and Vulcan engaged in discussions and negotiations regarding a business combination.  Throughout the discussions, Martin Marietta reaffirmed its genuine interest in acquiring Vulcan.  Martin Marietta explained that a combination of the companies would generate significant cash flow, allowing for payment of significantly higher cash dividends than were then being paid by Vulcan to its shareholders.  Additionally, Martin Marietta noted that the combined company would be a global leader in construction aggregates with a much stronger balance sheet.

42.     Martin Marietta ultimately proposed an all-stock offer for Vulcan, and explained that such a transaction structure would allow stockholders of both companies to participate in the growth and long-term value created by the combination.

43.     Martin Marietta also proposed that Don James, Vulcan's Chairman and CEO, serve as Chairman of the combined company and that Nye, Martin Marietta's CEO, serve as President and Chief Executive of the combined company.  This arrangement was unacceptable to James and he prevailed upon the Vulcan Board to terminate all discussions with Martin Marietta despite the many compelling reasons to entering a business combination with Martin Marietta.

44.     After May 2011, the Vulcan Board was completely unresponsive to Martin

Marietta's requests to negotiate a deal, and refused to discuss any possible strategic transaction.

**D.     Martin Marietta Commences The Exchange Offer for Vulcan and Announces Its Intention to Nominate Five Directors for Election to The Vulcan Board**

45.     Vulcan's refusal to negotiate in good faith forced Martin Marietta to take its offer

directly to Vulcan's shareholders.  On December 12, 2011, after months of trying to reopen

negotiations, Martin Marietta commenced an exchange offer to purchase all issued and

outstanding shares of Vulcan common stock in exchange for Martin Marietta's stock ("Exchange

Offer").

46.     Under the proposed terms of the Exchange Offer, each outstanding share of

Vulcan common stock would be exchanged for 0.50 shares of Martin Marietta common stock,

representing an 18% premium to Vulcan's stockholders based on the average per share prices for

both companies during the 30-day period ended December 9, 2011.  As detailed *infra*, Vulcan

has an array of anti-takeover devices in place that will prevent Vulcan shareholders from ever

having the opportunity to receive the remarkable return on their investment that Martin Marietta

is offering.  The total value of the Martin Marietta's offer was approximately $4.7 billion.

47.     The terms of Martin Marietta's proposal are not only favorable financially, but

also pose no genuine risk to Vulcan's core operations.  Martin Marietta's proposal contemplates

directors from both companies joining the board of the combined company and reiterates Martin

Marietta's offer to allow James to serve as Chairman of the combined company.  Under the

proposal, Martin Marietta has also committed to maintaining a major presence in Birmingham,

Alabama, where Vulcan is based.

48.     Concurrent with the commencement of the Exchange Offer and in anticipation of

Vulcan's defensive posture, Martin Marietta also announced its intention to nominate five

independent candidates for election to the Vulcan Board at the Company's 2012 annual meeting. Vulcan's staggered Board structure means that only a third of Vulcan's directors are up for election in any given year, requiring Martin Marietta to need to win two successive proxy contests to effectively take control of the Vulcan Board.

49.     On December 21, 2011, the Vulcan Board formally rejected Martin Marietta's December 12 offer, stating that "[t]he Vulcan board believes Vulcan is significantly better positioned than Martin Marietta to create shareholder value as the economy improves, that the proposed transaction would likely dilute rather than enhance value for Vulcan shareholders, and is skeptical of the purported financial benefits of a combination."

50.     The Board assertion rings hollow in light of the Vulcan's precipitous and continued decline, and the widening gap between the two companies.  In response to the Vulcan Board's formal rejection, Martin Marietta issued its own statement that same day.  Nye, Martin Marietta's President and CEO, stated:

> The announcement made by Vulcan today in response to our business combination proposal does not change our view – and we believe the view of many Vulcan shareholders – that our offer represents a compelling opportunity for Vulcan's shareholders and all of its other constituencies. Vulcan misses the point by ignoring the significant incremental value creation inherent in this combination. We are proposing a stock-for-stock merger combination in which Vulcan shareholders would own over 58% of the combined company and receive an upfront premium based on pre-announcement stock prices. The transaction would create a U.S.-based company that is the global leader in construction aggregates with a footprint reaching across North America. The combined company would be well-positioned for growth and success with one of the strongest balance sheets in the industry and a dividend that is 20 times Vulcan's current level …
>
> It remains Martin Marietta's strong preference to meet with Vulcan to engage in discussions in order to reach a definitive agreement to combine our two companies. Since announcing our proposal on December 12, 2011, we have spoken with a number of Vulcan shareholders, many of whom are also Martin Marietta shareholders, and we are pleased with the

support we have received regarding the combination and the powerful financial and operational benefits it is expected to deliver. We are committed to completing this combination and are moving forward on a number of fronts to make it a reality. We encourage Vulcan shareholders to send a strong message to their Board that the proposed combination is a compelling opportunity for Vulcan's shareholders, customers, employees and communities.

**E.   There Are Numerous Compelling Reasons for a Combination of Vulcan and Martin Marietta**

51.     There are many compelling financial and strategic benefits to a combination of Martin Marietta and Vulcan.  First, the proposed combination would create the dominant domestic aggregates company in America with a combined market capitalization of about $7.7 billion and a combined total enterprise value of $11.4 billion (based on the companies' respective stock prices on December 9, 2011).  The combined company would have 15 percent of the market share, more than twice the size of the next closest competitor.  Total mineral reserves for the combined company would be in excess of 28 billion tons and aggregate shipments of nearly 280 million tons annually, tops in the industry.  Moreover, as analysts recognize, due to the localized nature of aggregates production and the scant geographic overlap in the companies' businesses, the proposed combination will likely be approved by regulators with minimal divestitures.

52.     Second, cost-cutting opportunities would provide an estimated $200-$250 million in synergies in two to three years.  Martin Marietta management is targeting $50-$60 million in purchasing benefits due to scale efficiencies, $50-$60 million through the elimination of duplicative operating functions, and $100-$130 million in SG&A savings primarily through headcount reduction.  With the cost savings, the combined company's EBITDA would be projected to jump 30%.

53.     Third, the combined company will have one of the industry's strongest balance sheets and a strict operational and financial discipline (bought by Martin Marietta) which will position the company to pursue a wide range of growth opportunities.  The combination would address current investor concerns about Vulcan's heavily leveraged balance sheet, as the combined entity is expected to have (pro forma) net leverage of 4.2x compared with Vulcan's current 8.9x.

54.     Fourth, the combination will deliver direct value to shareholders.  Martin Marietta has publicly expressed its intention to maintain its current dividend of $1.60 per share if the companies agree to a business combination.  Based on the proposed exchange ratio, this translates into $0.80 per share for Vulcan shareholders compared with the penny dividend that the Company currently pays.

55.     Overall, Martin Marietta's offer represents a $4.8 billion total value for Vulcan at 24 times Vulcan's EBITDA.  According to data compiled by Bloomberg, this multiple is the highest on record for an acquisition greater than $500 million of a U.S. maker of building materials such as cement, where the median is only a 10.4 multiple.  Moreover, in the deal, Martin Marietta has offered to assume Vulcan's $2.7 billion in net debt, pushing the deal value to $7.5 billion.

56.     This offer comes after a sustained deterioration in Vulcan's performance, which analysts expect to decline further next year as the slump in construction spending continues.  The proposed combination allows Martin Marietta to bring better finances and cost discipline to Vulcan's chronically high spending, and would provide substantial upside to Vulcan's shareholders where none would otherwise be expected.

57.     Under any conceivable metric, Martin Marietta's offer, which is triple the average premium paid in acquisitions of cement makers during the last three years, should at least serve as a starting point for negotiations.  Nonetheless, the Vulcan Board has rejected all offers and terminated all discussions with Martin Marietta about a potential deal.

**F.      The Vulcan Board Stands Behind an Impenetrable Array of Anti-Takeover Devices**

58.     Instead of negotiating in good faith with Martin Marietta regarding a potential business combination which would create substantial synergies and strengthen Vulcan's balance sheet, the Vulcan Board has decided to hide behind an array of defensive devices which preclude any third party takeover of Vulcan in a reasonable time horizon without the consent of the Vulcan Board.

59.     The Individual Defendants have caused the Company to provide for a staggered board of directors.  In order to take over the Vulcan Board via a proxy fight, a potential acquirer must therefore win two consecutive stockholder elections, a feat that is unrealistic, even for a *bona fide* bidder in light of the cost and burden of maintaining an open takeover bid for so long in the current volatile market.

60.     The Company's Charter also sets forth that no director may be removed except for cause (and only upon determination of a majority of the Board), and that the staggered Board provision may not be altered without a supermajority vote of at least 80 percent of all stockholders.  Such a staggered board is known in takeover parlance as an "Effective Staggered Board" ("ESB") because stockholders lack the effective power to terminate its existence.

61.     Additional entrenchment measures include the Board's unilateral ability to increase the size of the Vulcan Board without stockholder approval, and the Individual Defendants' ability to choose who fills vacancies on the Board.  The Vulcan Board may also

unilaterally add or change bylaws (other than bylaws adopted by Vulcan shareholders which by their terms may not be altered) as the Individual Defendants see fit.

62. Vulcan's Charter, which requires director nominees to submit questionnaires, provides the Board with further ammunition to frustrate a nonconsensual takeover. Section 1.05 of the Charter requires prospective Board nominees to satisfy certain requirements in order to be eligible for election to the Vulcan Board. The section provides in relevant part:

> To be eligible to be a nominee for election or reelection as a director for the corporation, a person must deliver (in accordance with the time period prescribed for delivery of notice under Section 1.05 of these By-laws) to the Secretary … a written questionnaire with respect to the background and qualification of such person and the background of any other person or entity on whose behalf the nomination is being made.

63. Pursuant to Section 1.05, prospective nominees must also make a written representation as to the following:

> that such person (A) is not and will not become a party to (1) any agreement, arrangement or understanding with, and has not given any commitment or assurance to, any person or entity as to how such person, if elected as a director of the corporation, will act or vote on any issue or question (a "Voting Commitment") that has not been disclosed to the corporation or (2) any Voting Commitment that could limit or interfere with such person's ability to comply, if elected as a director of the corporation, with such person's fiduciary duties under applicable law, (B) is not and will not become a party to any agreement, arrangement or understanding with any person or entity other than the corporation with respect to any direct or indirect compensation, reimbursement or indemnification in connection with service or action as a director that has not been disclosed therein, and (C) in such person's individual capacity and on behalf of any person or entity on whose behalf the nomination is being made, would be in compliance, if elected as a director of the corporation, and will comply with all applicable publicly disclosed corporate governance, conflict of interest, confidentiality and stock ownership and trading practices and guidelines of the corporation.

64. Vulcan could use these provisions to frustrate Martin Marietta's ability to promptly nominate candidates to the Vulcan Board to be elected at the 2012 annual shareholder

meeting, for example, by imposing unreasonable deadlines to complete the questionnaires or unduly burdensome requirements.

65.     Additionally, the Company has not opted out of the New Jersey Shareholders Protection Act.  The New Jersey Shareholders Protection Act provides in relevant part:

> Notwithstanding anything to the contrary contained in this act (except section 6 of this act), no resident domestic corporation shall engage in any business combination with any interested stockholder of that resident domestic corporation for a period of five years following that interested stockholder's stock acquisition date unless that business combination is approved by the board of directors of that resident domestic corporation prior to that interested stockholder's stock acquisition date.  N.J.S.A. § 14A:10A-4.

66.     An "interested stockholder," as defined in the Act, is "any person" that "is the beneficial owner, directly or indirectly, of 10% of more of the voting power of the outstanding voting stock of that resident domestic corporation."  N.J.S.A. § 14A:10A-3(j)(1).

67.     Thus, if Martin Marietta acquires more than 10% of Vulcan's outstanding common stock in the Exchange Offer, Martin Marietta will be deemed an "interested stockholder" and Martin Marietta will be precluded from conducting a second-step merger for five years.  If the New Jersey Shareholders Protection Act is applied to Vulcan, the Vulcan Board's position effectively eliminates Martin Marietta's ability to consummate a back-end merger even if a majority of Vulcan's shareholders tender into the Exchange Act.

68.     Further, Article VIII.A of the Vulcan Charter provides that approval of a "business combination" with any "Interested Stockholder" (generally, any person who  becomes "the beneficial owner, directly or indirectly, of 10% of more of Vulcan's voting stock) requires the affirmative vote of holders of 80 percent of the Company's outstanding capital stock entitled to vote (unless such merger is approved by a majority of Vulcan's "Continuing Directors" or certain fair price conditions, as defined in Vulcan's Charter, are met).  Therefore, just as with the

New Jersey Shareholders Protection Act, the super majority provision of Article VIII.A deals a fatal blow to Martin Marietta's ability to consummate a second-step merger because achieving 80 percent shareholder support without Board approval is nearly impossible.

69.     The combination of the defensive devices described herein creates an insuperable barrier that practically precludes any attempt to acquire the Company without the Vulcan Board's consent.

70.     Vulcan has already stated its intent to stand behind these defensive measures and protections and demonstrated its abject refusal to consider the Martin Marietta Exchange Offer (or any previous offers) in good faith.  Martin Marietta recently filed suit against Vulcan in New Jersey Superior Court for an injunction to prevent Vulcan from improperly using the unusual questionnaire feature of Vulcan's bylaws to frustrate the Vulcan shareholders' ability to vote on candidates to the Vulcan Board, and to prevent Vulcan from misusing the New Jersey Shareholder Protection Act and the Company's Charter to impede shareholders from having the opportunity to consider and accept Martin Marietta's proposals.

71.     In response, Vulcan accused Martin Marietta of "covertly plotting a hostile bid" while the discussions between the companies were ongoing (prior to being terminated by Vulcan).  While Martin Marietta CEO Nye has previously stated (and reiterated in a recent letter to Vulcan's Board) that he would prefer a friendly deal, Vulcan explained in its New Jersey filing that there is no chance of that happening, stating:

> The offer is conditioned on the approval of Vulcan's board of directors –
> another condition that has no likelihood of being satisfied any time in the
> foreseeable future, if any.

72.     Additionally, in a further step to stop the Exchange Offer, Vulcan filed suit in Alabama federal court alleging that Martin Marietta has improperly exploited nonpublic

information about Vulcan in making its offer.[1]  In that action, Vulcan seeks a declaratory judgment that Martin Marietta breached certain confidentiality agreements between the companies in disclosing certain information in the Exchange Offer.   The Vulcan complaint alleges that:

> Martin Marietta is not permitted to maintain its exchange offer without disclosing all the material nonpublic information about Vulcan that it has received as detailed herein.  However, Martin Marietta is prohibited from disclosing all such material nonpublic information by virtue of its confidentiality undertakings.

73.    Vulcan has also recently announced a restructuring in a further attempt to prevent consummation of any offer to acquire the Company.  Vulcan announced on December 19, 2011 that it is consolidating its eight divisions into four separate operating regions.  As a result, some 200 positions will be eliminated.  As Vulcan explained in its press release, the consolidation will require the Company to record a charge of approximately $10 million on a pre-tax basis, or $0.05 per share after tax, during the fourth quarter of 2011.

## CLASS ACTION ALLEGATIONS

74.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all other holders of Vulcan's common stock (except Defendants herein and any persons, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from Defendants' wrongful actions, as more fully described herein (the "Class").

75.    This action is properly maintainable as a class action.

76.    The Class is so numerous that joinder of all members is impractical.  As of September 30, 2011, Vulcan had more than 129 million shares of common stock outstanding,

---

[1]    The case is captioned Vulcan Materials Co. v. Martin Marietta Materials Inc., 11-4248,

held by individuals and entities too numerous to bring separate actions.  It is reasonable to assume that there are thousands, if not hundreds of thousands, of beneficial holders of Vulcan common stock which are geographically dispersed throughout the United States.

77.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*:

> (i)     whether the Individual Defendants have fulfilled, and are capable of fulfilling, or have breached their fiduciary duties to Plaintiff and other members of the Class, including their duties of loyalty, due care, candor, good faith and fair dealing;
>
> (ii)    whether the Individual Defendants' refusal to consider and respond in good faith to Martin Marietta's interest in entering a business combination and other offers is a breach of their fiduciary duty;
>
> (iii)   whether the defensive devices described *supra* are reasonable under the circumstances and/or fair to members of the Class;
>
> (iv)    whether the Defendants have disclosed all material facts in connection with their decision not to consider and respond in good faith to acquisition offers which are in the best interest of members of the Class; and
>
> (v)     Whether Plaintiff and other members of the Class would be irreparably damaged if the Individual Defendants are not compelled to consider and respond in good faith to Martin Marietta's offers.

---

U.S. District Court, Northern District of Alabama (Birmingham).

78.     Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.

79.     The Individual Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

80.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff is a member of the Class; its claims are typical of the claims of the other members of the Class, and it is aware of no interests which it has which may be antagonistic to those of other Class members with respect to this litigation. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

81.     Plaintiff and the Class have suffered damages and will continue to suffer additional damages as a result of the acts and conduct of and breaches of fiduciary duties by the Individual Defendants alleged herein.

82.     The prosecution of separate actions would create the risk of (i) inconsistent or varying adjudications which would establish incompatible standards of conduct for the Defendants, and/or (ii) adjudications which would as a practical matter be dispositive of the interests of other members of the Class.

## COUNT I

### (Breach of Fiduciary Duty Against the Individual Defendants)

83.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

84.     By virtue of their positions as directors of Vulcan, the Individual Defendants owe fiduciary duties of care and loyalty to Vulcan and its stockholders.  This requires the Individual Defendants to consider all shareholder value-maximizing transactions in good faith; and base material decisions on adequate information and deliberation consistent with their duties of loyalty and care.

85.     The Individual Defendants have failed to fulfill their fiduciary duties by not responding in good faith to the Martin Marietta's offer.

86.     In violation of their fiduciary duties, the Individual Defendants have refused to take appropriate action relating to the Company's array of defensive devices in response to *bona fide* expressions of interest from Martin Marietta for the sole purpose of entrenching themselves. These actions, taken indefinitely, represent an unreasonable response to Martin Marietta's offer and a violation of the fundamental rights of Plaintiff and the Class.

87.     By maintaining the defensive devices, the Vulcan Board also purposefully interfered with the stockholder franchise.

88.     By engaging in the foregoing conduct, the Individual Defendants have breached and are continuing to breach their fiduciary duties of loyalty and care by, among other things, failing to act in the interest of Vulcan's stockholders.

89.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties and violate New Jersey law to the detriment of Vulcan and its stockholders.

90.     Plaintiff and the Class have no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment as follows:

(i)    Declaring this action properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as Class Representative and its attorneys as Class Counsel to represent the Class members;

(ii)    Finding the Individual Defendants liable for breaching their fiduciary duties, including fiduciary duties of loyalty, good faith, fair dealing, and due care by, inter alia, conduct in refusing to consider and respond in good faith to offers to acquire Vulcan, including the offers made by Martin Marietta;

(iii)    Ordering the Individual Defendants to affirmatively fulfill their fiduciary duties to Plaintiff and the other members of the Class by acting to undertake an appropriate evaluation of alternatives to maximize value for Martin Marietta's public stockholders including, but not limited to, the offer by Martin Marietta;

(iv)    Enjoining the Individual Defendants from taking any further action designed to frustrate any potential transaction that would maximize shareholder value, including the Martin Marietta Offer;

(v)    Preliminary and permanently enjoining the Individual Defendants placing their own interests ahead of those of Vulcan and its shareholders by refusing to consider and respond in good faith to Martin Marietta's pending Exchange Offer (and any other offers) that would maximize value to Vulcan shareholders;

(vi)    Preliminary and permanently enjoining the Individual Defendants from initiating any defensive measures which may render the acquisition of the Company more burdensome or expensive for Martin Marietta or any other potential acquirer;

23

(vii)   Entering such injunctive relief as may be appropriate, including rendering the New Jersey Shareholders Protection Statute and Article VIII.A of Vulcan's Charter inapplicable to the Martin Marietta Exchange Offer;

(viii)  Preliminary and permanently enjoining the Vulcan Board from using Section 1.05 of Vulcan's Charter in an attempt to frustrate Martin Marietta's ability to nominate candidates for election to the Vulcan Board at the 2012 annual meeting;

(ix)    Awarding Plaintiff the costs and disbursements of this section, including attorneys', accountants' and expert fees; and

(x)     Awarding such other and further relief as is just and equitable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiffs


By:    /s/ James E. Cecchi
       JAMES E. CECCHI

Dated:  December 28, 2011

Of Counsel:

Jay W. Eisenhofer
Stuart M. Grant
John C. Kairis
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
Telephone:  (302) 622-7000

Mark Lebovitch
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
       & GROSSMANN LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 554-1400

Eric J. O'Bell
O'BELL, LLC
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone:  (504) 456-8677

Paul M. Brannon
BRANNON LAW FIRM, LLC
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone:  (504) 456-8696

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiff


By:     /s/ James E. Cecchi
           JAMES E. CECCHI

Dated:  December 28, 2011

Of Counsel:

Jay W. Eisenhofer
Stuart M. Grant
John C. Kairis
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
Telephone:  (302) 622-7000

Mark Lebovitch
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 554-1400

Eric J. O'Bell
O'BELL, LLC
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone:  (504) 456-8677

Paul M. Brannon
BRANNON LAW FIRM, LLC
3500 North Hullen Street
Metairie, Louisiana 70002
Telephone:  (504) 456-8696